IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| NICHOLAS CUMMINGS,<br>    Plaintiff, | )<br>)<br>) | |
| v. | )<br>) | Civil Action No. 3:23CV327 (RCY) |
| THE GEO GROUP, INC.,<br>    Defendant. | )<br>)<br>)<br>) | |

**MEMORANDUM OPINION**

This matter is before the Court on Defendant's Partial Motion to Dismiss (ECF No. 13). The motion has been fully briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J). For the reasons stated herein, the Court will deny the Motion to Dismiss.

**I. BACKGROUND**

When deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court "accept[s] as true the plaintiff's well-pleaded allegations and views all facts and draws all reasonable inferences in the light most favorable to plaintiff." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Such a standard, however, does not require accepting any unreasonable inferences or plaintiff's legal conclusions. *Id.* Additionally, a court may consider any documents attached to the complaint. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (stating that "a court may consider [a document outside the complaint] in determining whether to dismiss the complaint" where the document was "integral to and explicitly relied on in the complaint" and there was no authenticity challenge). Applying these standards, the Court construes the facts in the Complaint, including any attached documents, as follows.

Defendant GEO Group, Inc. ("Defendant" or "GEO") is a publicly traded corporation that was founded as a "for-profit company that owns, leases, and operates prisons, immigration detention centers, and residential re-entry centers." Compl. ¶ 7. Defendant operates numerous facilities throughout the country and is "one of the two largest private operators of for-profit prisons in the United States." *Id.*; *see id.* at ¶¶ 2, 7–8, 18–27. Since 2003, Defendant has operated Lawrenceville Correctional Center ("LVCC"), the only privately-run prison in Virginia. *Id.* at ¶ 11 (citing Jakob Cordes, *Virginia private prison prepares for renovations amid state overdose investigation*, ABC8 NEWS (Sept. 7, 2022), https://www.wric.com/news/local-news/virginia-private-prison-prepares-for-renovations-amid-state-overdose-investigation/ [https://perma.cc/74RQ-LJY8].

Over the course of Defendant's operation of LVCC, "it has been 'routinely understaffed and in violation of its contract [with VDOC].'" *Id.* at ¶ 12 (quoting Cordes, *supra*). LVCC has fewer guards than other state correctional facilities, pays those guards less, and sometimes requires them to work more. *Id.* (citing Kerri O'Brien, *Senator pushing to end a 'prison for profit' in Virginia*, ABC8 NEWS (Dec. 22, 2020), https://www.wric.com/news/taking-action/push-to-end-a-prison-for-profit-in-virginia/ [https://perma.cc/UJ6M-MV5B]. As a result of this "intentional" understaffing "to maximize profit," GEO has frequently paid fines "for failing to meet the terms of its contract with VDOC." *Id.* at ¶ 13. (citing Kerri O'Brien, *Virginia's only private prison is routinely short-staffed and in breach of its contract with the state*, ABC8 NEWS (Jan. 25, 2021), https://www.wric.com/news/taking-action/virginias-only-private-prison-is-routinely-short-staffed-and-in-breach-of-its-contract-with-the-state/ [https://perma.cc/6TBQ-A39T]. This understaffing has apparently rendered Defendant unable to adequately control or oversee its facilities. *Id.* at ¶ 29. Instead, "gangs virtually run the institution," *id.* at ¶ 29 (quoting Compl. Ex. B (Virginia Interfaith Ctr. for Pub. Pol'y with Soc. Action Linking Together, *Lawrenceville Correctional*

*Center: For-Profit Prison Run Amok* (Oct. 2022)) at 13, ECF No. 1-3), and have transformed LVCC into a place where drug trafficking, overdoses, and violence are commonplace, *see id.* at ¶¶ 27–47.

Plaintiff Nicholas Cummings was initially incarcerated at LVCC in October of 2019. Compl. Ex. C ("Cummings Decl.") ¶ 2. Plaintiff "witnessed firsthand the lack of institutional control at LVCC and he soon realized that gang members controlled the facility." Compl. ¶ 44. Particularly notable to Plaintiff was the "stunningly large drug operation" orchestrated by the gang control at LVCC:

> [Plaintiff] witnessed so many narcotics at LVCC that he knew it was impossible for them to be brought in by drones alone. The only way that quantity could be moved through the facility was if the staff was working with the gang members to bring it in. In particular, there were large quantities of Fentanyl moving through LVCC. The drug traffickers would cut the Fentanyl with powdered milk and then test the mixtures on other inmates. It was by virtue of this rudimentary and dangerous testing method that many of the overdoses occurred.

*Id.* at ¶¶ 45–46.

Plaintiff eventually witnessed another inmate overdose, as well as the subsequent attempt to resuscitate him. *Id.* at ¶ 48. Because he witnessed the event, Plaintiff was "pulled out several times by investigating officers and questioned, resulting in his being labeled a snitch." *Id.* at ¶ 49. And according to Plaintiff, "at LVCC anyone labeled as a 'snitch' got 'dealt with.'" *Id.* Plaintiff was no exception. *See id.* On February 5, 2021, Plaintiff's cellmate passed a gang hitman a knife and the hitman attacked Plaintiff, "stabbing him approximately 15 times in the head, neck, chest, back, arms, hands, abdomen, and armpit." *Id.* Plaintiff "[m]iraculously" survived the encounter, but "was so terrified of further retaliation that he refused to go to the hospital." *Id.* at ¶ 50. Defendant's employees proved to be of no help either, and instead encouraged him not to file a tort claim, and even told him that "details regarding the stabbing incident were 'erased out of the system.'" *Id.*

The consequences associated with Plaintiff's "snitch" label did not improve after the stabbing incident, as he "was subjected to regular 'minor' assaults as a means of control and intimidation." *Id.* at ¶ 51.  Defendant's staff "did little or nothing to curtail the violence against [Plaintiff] and, in fact, the majority of the staff appeared to be cooperating with the gang activities or, at best, ignoring them." *Id.* at ¶ 52.  In fact, those committing these violent acts against Plaintiff "were not reclassified, moved, or subject to any apparent discipline." *Id.*  Eventually, the violence against Plaintiff worsened. *Id.* at ¶ 53.  Gang members began to extort Plaintiff (and his family) in exchange for "protection" from beatings. *See id.* at ¶¶ 53–66.  Plaintiff's ability to pay was quickly exhausted, however, and the beatings continued—and increased in severity. *Id.* at ¶ 53.  One such beating perforated Plaintiff's left eardrum. *Id.* at ¶ 54.  However, Plaintiff was "so scared of retaliation that when he reported the injury to medical a week later he said he 'fell and hit his head on bed,' but it was obvious to the medical provider that the 'trauma [was] most likely from other <u>offenders</u>.'" *Id.* (emphasis in original).

On April 27, 2022, Plaintiff asked his grandmother for assistance in paying gang members to resume "protecting" him from harm while incarcerated at LVCC. *Id.* at ¶ 55.  Over the course of two-and-a-half months, Plaintiff's grandmother, Kay Cummings ("Ms. Cummings") paid nearly $10,000 to members of a gang within LVCC to protect Plaintiff. *Id.* at ¶¶ 55–58.  Then, in the middle of July 2021, Ms. Cummings refused to make further payments. *Id.* at ¶ 59.  At that point, she began receiving calls from Plaintiff and his cellmate "asking for money to 'stop something terrible from happening.'" *Id.* at ¶ 59.  Having already expended a substantial sum of money, Ms. Cummings maintained her refusal to pay. *Id.*

With Plaintiff's "ransom still unpaid, the gang 'protection' ended" on July 21, 2022. *Id.* at ¶ 60.  It was then that "[g]ang members sent a 'hitman' into [Plaintiff's] cell to assault [him]." *Id.*  Plaintiff's cellmate, Kenneth Scott Marshall ("Marshall") recounted the details of the attack,

wherein Plaintiff was "pinned . . . against the wall [and] repeatedly punched[ed] in the face" by a hitman ("Epps") wearing huge gloves that were likely "packed with salt to pack a harder punch." *Id.* Plaintiff then fell to the ground, and Epps began stomping his head, at which point Marshall attempted to intervene. *Id.* Epps briefly "lunged toward [Marshall]" before absconding. *Id.* Marshall then "grabbed a towel and tried to stop the bleeding," and helped get Plaintiff to "medical." *Id.* at ¶¶ 60–61. Marshall noted that when they arrived at medical, Plaintiff "was still screaming . . . . His lower right eye lid was split open hanging on his face, and it looked like his eye might have been smashed." *Id.* at ¶ 61. Thereafter, Plaintiff was sent to the VCU trauma center "where the decision was made to have him airlifted to UNC Health for admission and oculoplastic management." *Id.* At UNC, Plaintiff was diagnosed with "significant blunt facial trauma resulting in right orbital fracture involving gas in the preseptal space and a large laceration of the lower right eyelid." *Id.* at ¶ 62. Plaintiff required reconstructive surgery, which took place on July 23, 2022. *Id.*

Plaintiff is now left with "a catalog of injuries," some temporary and some permanent, resulting from the "numerous assaults, extortion, and harassment" he endured at LVCC. *Id.* at ¶ 63. Plaintiff was ultimately transferred out of LVCC in September 2022. According to Plaintiff, "[h]is survival of his ordeal [at LVCC] was in *spite of* [Defendant's] policy and custom of indifference to the conditions of his confinement at LVCC." *Id.* at ¶ 64 (emphasis in original).

## II. PROCEDURAL HISTORY

Plaintiff filed his Complaint on May 15, 2023, asserting a sole, constitutional cause of action relating primarily to Defendant's alleged policy and custom of understaffing. Compl. ¶¶ 78–85. Specifically, Plaintiff avers that Defendant's "deliberate indifference caused . . . deficient staffing, supervision and control which, in turn, . . . caused Plaintiff's injuries." *Id.* at ¶ 85. On July 13, 2023, Defendant filed the instant Partial Motion to Dismiss, seeking to dismiss

5

Plaintiff's claims for relief accruing prior to May 15, 2021.  Mot. Dismiss 1, ECF No. 13; Mem. Supp. Partial Mot. Dismiss 1, ECF No. 14.  Plaintiff filed his Memorandum in Opposition to Defendant's Partial Motion to Dismiss on July 27, 2023.  ECF No. 18.  Defendant filed a Reply in Support of its Motion to Dismiss on August 2, 2023.  ECF No. 19.  Accordingly, this matter is ripe for disposition.

### III. LEGAL STANDARD

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  Dismissals under Rule 12(b)(6) are generally disfavored by the courts because of their res judicata effect.  *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1471 (4th Cir. 1991).  Federal Rule of Civil Procedure 8 only requires that a complaint set forth "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required in order to satisfy the pleading requirement of Federal Rule 8(a)(2).  *Id.* (citations omitted).  "[A] motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief."  *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  The plaintiff's well-pleaded allegations are assumed to be true, and the complaint is viewed in the light most favorable to the plaintiff.  *Id.* (citations omitted); *see also Martin*, 980 F.2d at 952.

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Labels and conclusions," a "formulaic recitation of the elements," and "naked assertions" without factual enhancement are insufficient. *Id.*

Finally, motions to dismiss under Rule 12(b)(6) "generally cannot reach the merits of an affirmative defense, such as the defense that plaintiff's claim is time-barred." *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). However, "in the relatively rare circumstances where acts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached" by a Rule 12(b)(6) motion to dismiss. *Id.* The burden of establishing such affirmative defenses rests with the defendant. *See id.*

## IV. DISCUSSION

Defendant moves to dismiss Plaintiff's claims for relief accruing prior to May 15, 2021, based on an argument that such claims are barred by the applicable statute of limitations. Def.'s Mem. Supp. Mot. Dismiss ("Mem. Supp.") 1, ECF No. 13. Plaintiff responds that the continuing violation doctrine tolls the statute of limitations in this type of Section 1983 action, and therefore preserves the portions of his claim that would otherwise be untimely. *See* Pl.'s Mem. Opp'n Mot. Dismiss ("Mem. Opp'n") 2–3, ECF No. 18. Because Plaintiff is correct that the continuing violation doctrine applies here, the Court will deny Defendant's Motion to Dismiss.

**A. The Applicable Statute of Limitations Is Two Years**

Section 1983 does not contain a statute of limitations. *See* 42 U.S.C. § 1983. Accordingly, the Fourth Circuit has held that "[i]n cases brought under Section 1983, we apply the statute of limitations for personal injuries of the state in which the alleged violations occurred." *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) (citing *Wallace v. Kato*, 549 U.S. 384, 387 (2007)). Here, the injuries occurred in Virginia, and Virginia plaintiffs must generally bring a personal injury action within two years of the date that the cause of action accrues. Va. Code § 8.01-243(A).

**B. Plaintiff's Claim Is Timely Pursuant to The Continuing Violation Doctrine**

1. <u>The Continuing Violation Doctrine Generally</u>

While state law provides the statute of limitations for Section 1983 actions, "the accrual date of [such actions] is a question of federal law that is *not* resolved by reference to state law." *Wallace*, 549 U.S. at 387 (emphasis in original). In turn, the Fourth Circuit has held that Section 1983 claims of deliberate indifference ordinarily accrue "when a plaintiff becomes aware or has reason to know of the harm inflicted." *DePaola*, 884 F.3d at 486. However, the "continuing violation" doctrine—a principle of federal common law—provides an exception to this general rule. *Id.*

The continuing violation doctrine holds that "when a harm has occurred more than once in a continuing series of acts or omissions, a plaintiff . . . may allege a 'continuing violation' for which the statute of limitations runs anew with each violation." *Id.*; *see Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001). A violation is deemed "continuing" when it "would be unreasonable to require or even permit [the plaintiff] to sue separately over every incident of the defendant's unlawful conduct." *Tarpley v. Hogan*, 2016 WL 4888914, at *7 (D. Md. Sept. 15, 2016) (alteration in original) (quoting *Heard*, 253 F.3d at 319), *appeal dismissed*, 2016 WL 9818272 (4th Cir. Dec. 8, 2016). Thus, when the continuing violation doctrine is applicable, the "statute of limitations

8

begins to run 'from the date of the last incidence of that violation, not the first.'" *Id.* (quoting *Cesal v. Moats*, 851 F.3d 714, 722 (7th Cir. 2017) (quoting *Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013))).

The Fourth Circuit in *DePaola* set forth a two-prong test for establishing a Section 1983 claim for deliberate indifference under the continuing violation doctrine: "[A] plaintiff must (1) identify a series of acts or omissions that demonstrate deliberate indifference to his serious[, ongoing] . . . need(s); and (2) place one or more of these acts or omissions within the applicable statute of limitations for person injury." *DePaola*, 884 F.3d at 486 (4th Cir. 2018). While *DePaola* itself specifically concerned deliberate indifference to medical needs, courts in this circuit have applied it in other Section 1983 contexts as well. *See, e.g.*, *Burgess v. Anderson Cnty. Det. Ctr.*, 2020 WL 5701897, at *2 (Sept. 24, 2020) ("The Court is unaware of any reason [that *DePaola*] would not apply to [plaintiff's] Section 1983 failure to protect/deliberate indifference claim."); *Hall v. Stouffer*, 2018 WL 8335491, at *11 (D. Md. Sept. 25, 2018) ("Although the Fourth Circuit has not applied the continuing violation doctrine to an access to courts claim, the reasoning in *DePaola* is analogous to this case.").

2. The Continuing Violation Doctrine Compels the Denial of Defendant's Motion to Dismiss

Turning to the parties' arguments, Defendant contends that Plaintiff's claims "accruing prior to May 15, 2021, including specifically the incident occurring on February 5, 2021" should be dismissed as outside the applicable statute of limitations. Mem. Supp. 3–4. In support of this contention, Defendant makes three main points: (1) the caselaw "does not support a finding of continuous violation where a collection of actors from a single institution are alleged to have committed the continuous wrong"; (2) Plaintiff identified discrete and distinguishable causes of action that he could have and should have timely raised as different claims; and (3) Plaintiff "fails to identify any specific facts that support a continuing violation between February 5, 2021, and

9

May 15, 2021." Reply Supp. Mot. Dismiss ("Reply") 2–3, ECF No. 19.  In response, Plaintiff argues that the continuing violation doctrine does in fact toll the statute of limitations here, particularly because the Complaint "clearly and plausibly allege[s] continuing and ongoing violations by [Defendant] that created and perpetuated the unacceptable situation at LVCC." Mem. Opp'n 5; *see* Mem. Opp'n 3–5.  Ultimately, the Court finds that Plaintiff has plausibly alleged a continuing violation, thus preserving the entirety of his claim.

As a threshold matter, the Court finds that *DePaola* and its rationale do in fact apply to this type of understaffing-related deliberate indifference claim.  Plainly, the reasoning from *DePaola* still carries weight under such circumstances.  For instance, Plaintiff's allegations here concern a series of acts or omissions—i.e., Defendant's custom and/or policy of understaffing—that evinces deliberate indifference to Plaintiff's serious needs (i.e., safety and protection from other inmates). *See DePaola*, 884 F.3d at 487; *Burgess*, 2020 WL 5701897, at *2 (noting that the plaintiff sufficiently alleged a continuing violation under Section 1983 by identifying a series of acts or omissions that arguably demonstrated deliberate indifference to protecting him from another inmate).  Moreover, Plaintiff has placed one or more of these acts or omissions within the applicable statute of limitations for personal injury.  *See DePaola*, 884 F.3d at 487; Compl. ¶¶ 27–66 (alleging a custom or policy of understaffing at LVCC by Defendant for the entire time Plaintiff was incarcerated there, a large portion of which falls within the two-year statute of limitations).[1] The Court's conclusion in this regard is bolstered by the various courts within this circuit that have acknowledged the validity of applying *DePaola* in similar contexts.  *See, e.g., Burgess*, 2020 WL 5701897, at *2 (applying the continuing violation doctrine to plaintiff's Section 1983 failure to protect/deliberate indifference claim); *Hall v. Stouffer*, 2018 WL 8335491, at *11 (D. Md. Sept.

---

[1] Indeed, the statute of limitations on Plaintiff's Eighth Amendment claim did not begin to run until the date in which he was transferred out of LVCC, such that Defendant no longer had any duties as to Plaintiff, because his final day in Defendant's custody was the last incidence of the alleged violation.  *See Burgess*, 2020 5701897, at *2; *Tarpley v. Hogan*, 2016 WL 4888914, at *7 (D. Md. Sept. 15, 2016).

25, 2018) (applying the continuing violation doctrine to an "access to courts" claim); *Redding v. Anne Arundel Cnty.*, 996 F. Supp. 488, 490–91 (D. Md. 1998) (applying the continuing violation doctrine to a *Monell* claim); *Anselme v. Fluvanna Corr. Ctr. for Women*, 2020 WL 7407467, at *3 n.2 (W.D. Va. Dec. 17, 2020) (acknowledging that *DePaola* likely applies to failure to protect claims, as well as Section 1983 deliberate indifference claims more generally).

Moreover, the Court is unpersuaded by Defendant's remaining arguments against applying the continuing violation doctrine. First, contrary to Defendant's claim, it is not necessarily true that Plaintiff "identified discrete and distinguishable causes of action that he could have and should have timely raised as different claims misses the mark." Reply 3. Rather, Plaintiff has alleged an overarching policy or custom that facilitated the treatment he received at the hands of other inmates. *See* Compl. ¶¶ 27–66; 78–85. To be sure, Plaintiff *could* have attempted to sue individual officers (or other inmates) for the beatings he endured. However, that possibility does not *prevent* him from suing Defendant, who allegedly fostered the environment that caused Plaintiff's peril. *See, e.g., Burgess*, 2020 WL 5701897, at *2–3 (applying continuing violation doctrine to permit plaintiff's deliberate indifference/failure to protect claim to proceed against detention center *and* individual defendants); *see also Briggs v. Montgomery*, 2019 WL 2515950, at *22 (D. Ariz. June 18, 2019) (applying continuing violation doctrine where the plaintiff alleged a systemic constitutional violation that stemmed from an ongoing custom or policy).[2]

Defendant's final argument—that "Plaintiff fails to identify any specific facts that support a continuing violation between February 5, 2021, and May 15, 2021, the period for which

---

[2] The Court also notes that many varieties of Section 1983 claims, and particularly the sort of policy/custom *Monell* claim Plaintiff advances here, impose a heavy burden on plaintiffs. *See Sanchez v. Young Cnty.*, 956 F.3d 785, 793 (5th Cir. 2020). In view of this burden, if Plaintiff theoretically sued following the first incident described in the Complaint, he may have lacked sufficient evidence to support his *Monell* claim. Conversely, if the Court now excluded the portions of Plaintiff's claim related to the earlier incidents, Plaintiff would essentially be punished for ensuring his lawsuit was sturdy enough to withstand a Rule 12(b)(6) motion. Under such circumstances, it is unreasonable and unrealistic to expect a plaintiff to immediately sue an entity defendant and/or the individual actors involved. *See Hall*, 2018 WL 8335491, at *11 (quoting *Tarpley*, 2016 WL 4888914, at *7, *appeal dismissed*, 2016 WL 9818272 (4th Cir. Dec. 8, 2016)).

Defendant seeks a dismissal of claims"—also misses the mark. *See* Reply 3. Indeed, just two paragraphs after Plaintiff discusses the February 5, 2021, stabbing, he alleges that "the negative consequences associated with [his] 'snitch' label did not improve after the stabbing." Compl. ¶ 51. The Complaint continues by alleging that Plaintiff was subsequently "subjected to regular 'minor' assaults as a means of control and intimidation." *Id.* Plaintiff also notes that the violence he endured worsened, and that "[g]ang members began to extort [him] in exchange for [']protection' . . . . But [Plaintiff's] ability to pay the demands was quickly exhausted and the beatings continued." *Id.* at ¶ 53. Almost immediately thereafter, Plaintiff ties his predicament to Defendant's purported understaffing and lack of control by alleging that "[Defendant] did little or nothing to curtail the violence against [Plaintiff] and, in fact, the majority of the staff appeared to be cooperating with the gang activities or, at best, ignoring them." *Id.* at ¶ 52. The Court is satisfied that these allegations, particularly when read in the context of Plaintiff's Complaint more broadly, plausibly allege the existence of a continuing violation between February 5, 2021, and May 15, 2021. *See, e.g.,* Compl. ¶¶ 12–22, 25–42, 43–47, 49–53.

At bottom, the constitutional violations alleged here are "continuing," insofar as it "would be unreasonable to require or even permit [Plaintiff] to sue separately over every incident of [Defendant's] unlawful conduct." *Tarpley v. Hogan*, 2016 WL 4888914, at *7 (D. Md. Sept. 15, 2016) (alteration in original) (quoting *Heard v. Sheahan*, 253 F.3d 253 F.3d at 319), *appeal dismissed*, 2016 WL 9818272 (4th Cir. Dec. 8, 2016). Indeed, Plaintiff's allegations here sound in *Monell* liability, the very nature of which necessarily comports with the continuing violation doctrine. *See Redding*, 996 F. Supp. at 490–91 (D. Md. 1998) ("*Monell* . . . permits liability against [entities] to be premised on . . . a widespread, persistent pattern or practice of [entity] officials, or an official, systemic, policy decision, to state a claim under [Section] 1983. Thus, the continuing violation theory, and the pleading and proof requirements of [*Monell*], dovetail."); *see also*

*Gutowsky v. Cnty. of Placer*, 108 F.3d 256, 259 (9th Cir. 1997) (holding that "the continuing violation[] doctrine is applicable to *Monell* actions," because if it were inapplicable to such actions, it would be "difficult to ascertain exactly when such claims accrue."). Moreover, Plaintiff has satisfied the strictures of *DePaola* by (1) alleging a series of acts or omissions that evinces deliberate indifference to Plaintiff's serious needs and (2) placing one or more of these acts or omissions within the applicable statute of limitations for personal injury. *See DePaola*, 884 F.3d at 486. Accordingly, the continuing violation doctrine applies, and renders the entirety of Plaintiff's claim timely.

## V. CONCLUSION

For the reasons stated above, the Court will deny Defendant's Motion to Dismiss (ECF No. 13). An appropriate Order will accompany this Memorandum Opinion.

/s/ *RCY*
Roderick C. Young
United States District Judge

Richmond, Virginia
Date: January 23, 2024

13