IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| NICHOLAS CUMMINGS,  )<br>    Plaintiff,  )<br>  )<br>    v.  )<br>  )<br>THE GEO GROUP, INC.,  )<br>    Defendant.  )<br>  ) | Civil Action No. 3:23CV327 (RCY) |

**MEMORANDUM OPINION**

This matter is before the Court on Defendant's Motion to Bifurcate (ECF No. 22). On January 18, 2024, the Court conducted a hearing on the Motion to Bifurcate and denied the motion from the bench. This Memorandum Opinion sets forth the Court's reasoning for its decision.

**I. FACTUAL BACKGROUND**

The Court previously outlined the relevant factual background in its Memorandum Opinion concerning Defendant's Motion to Dismiss. *See* Mem. Op. 1–5, ECF No. 66. For present purposes, the Court borrows that factual recitation, which is as follows.

Defendant GEO Group, Inc. ("Defendant" or "GEO") is a publicly traded corporation that was founded as a "for-profit company that owns, leases, and operates prisons, immigration detention centers, and residential re-entry centers." Compl. ¶ 7. Defendant operates numerous facilities throughout the country and is "one of the two largest private operators of for-profit prisons in the United States." *Id.*; *see id.* at ¶¶ 2, 7–8, 18–27. Since 2003, Defendant has operated Lawrenceville Correctional Center ("LVCC"), the only privately-run prison in Virginia. *Id.* at ¶ 11 (citing Jakob Cordes, *Virginia private prison prepares for renovations amid state overdose investigation*, ABC8 News (Sept. 7, 2022), https://www.wric.com/news/local-news/virginia-

private-prison-prepares-for-renovations-amid-state-overdose-investigation/ [https://perma.cc/74RQ-LJY8].

Over the course of Defendant's operation of LVCC, "it has been 'routinely understaffed and in violation of its contract [with VDOC].'" *Id.* at ¶ 12 (quoting Cordes, *supra*). LVCC has fewer guards than other state correctional facilities, pays those guards less, and sometimes requires them to work more. *Id.* (citing Kerri O'Brien, *Senator pushing to end a 'prison for profit' in Virginia*, ABC8 News (Dec. 22, 2020), https://www.wric.com/news/taking-action/push-to-end-a-prison-for-profit-in-virginia/ [https://perma.cc/UJ6M-MV5B]. As a result of this "intentional" understaffing "to maximize profit," GEO has frequently paid fines "for failing to meet the terms of its contract with VDOC." *Id.* at ¶ 13. (citing Kerri O'Brien, *Virginia's only private prison is routinely short-staffed and in breach of its contract with the state*, ABC8 News (Jan. 25, 2021), https://www.wric.com/news/taking-action/virginias-only-private-prison-is-routinely-short-staffed-and-in-breach-of-its-contract-with-the-state/ [https://perma.cc/6TBQ-A39T]. This understaffing has apparently rendered Defendant unable to adequately control or oversee its facilities. *Id.* at ¶ 29. Instead, "gangs virtually run the institution," *id.* at ¶ 29 (quoting Compl. Ex. B (Virginia Interfaith Ctr. for Pub. Pol'y with Soc. Action Linking Together, *Lawrenceville Correctional Center: For-Profit Prison Run Amok* (Oct. 2022)) at 13, ECF No. 1-3), and have transformed LVCC into a place where drug trafficking, overdoses, and violence are commonplace, *see id.* at ¶¶ 27–47.

Plaintiff Nicholas Cummings was initially incarcerated at LVCC in October of 2019. Compl. Ex. C ("Cummings Decl.") ¶ 2. Plaintiff "witnessed firsthand the lack of institutional control at LVCC and he soon realized that gang members controlled the facility." Compl. ¶ 44.

Particularly notable to Plaintiff was the "stunningly large drug operation" orchestrated by the gang control at LVCC:

> [Plaintiff] witnessed so many narcotics at LVCC that he knew it was impossible for them to be brought in by drones alone. The only way that quantity could be moved through the facility was if the staff was working with the gang members to bring it in. In particular, there were large quantities of Fentanyl moving through LVCC. The drug traffickers would cut the Fentanyl with powdered milk and then test the mixtures on other inmates. It was by virtue of this rudimentary and dangerous testing method that many of the overdoses occurred.

*Id.* at ¶¶ 45–46.

Plaintiff eventually witnessed another inmate overdose, as well as the subsequent attempt to resuscitate him. *Id.* at ¶ 48. Because he witnessed the event, Plaintiff was "pulled out several times by investigating officers and questioned, resulting in his being labeled a snitch." *Id.* at ¶ 49. And according to Plaintiff, "at LVCC anyone labeled as a 'snitch' got 'dealt with.'" *Id.* Plaintiff was no exception. *See id.* On February 5, 2021, Plaintiff's cellmate passed a gang hitman a knife and the hitman attacked Plaintiff, "stabbing him approximately 15 times in the head, neck, chest, back, arms, hands, abdomen, and armpit." *Id.* Plaintiff "[m]iraculously" survived the encounter, but "was so terrified of further retaliation that he refused to go to the hospital." *Id.* at ¶ 50. Defendant's employees proved to be of no help either, and instead encouraged him not to file a tort claim, and even told him that "details regarding the stabbing incident were 'erased out of the system.'" *Id.*

The consequences associated with Plaintiff's "snitch" label did not improve after the stabbing incident, as he "was subjected to regular 'minor' assaults as a means of control and intimidation." *Id.* at ¶ 51. Defendant's staff "did little or nothing to curtail the violence against [Plaintiff] and, in fact, the majority of the staff appeared to be cooperating with the gang activities or, at best, ignoring them." *Id.* at ¶ 52. In fact, those committing these violent acts against Plaintiff

"were not reclassified, moved, or subject to any apparent discipline." *Id.* Eventually, the violence against Plaintiff worsened. *Id.* at ¶ 53. Gang members began to extort Plaintiff (and his family) in exchange for "protection" from beatings. *See id.* at ¶¶ 53–66. Plaintiff's ability to pay was quickly exhausted, however, and the beatings continued—and increased in severity. *Id.* at ¶ 53. One such beating perforated Plaintiff's left eardrum. *Id.* at ¶ 54. However, Plaintiff was "so scared of retaliation that when he reported the injury to medical a week later he said he 'fell and hit his head on bed,' but it was obvious to the medical provider that the 'trauma [was] most likely from other <u>offenders</u>.'" *Id.* (emphasis in original).

On April 27, 2022, Plaintiff asked his grandmother for assistance in paying gang members to resume "protecting" him from harm while incarcerated at LVCC. *Id.* at ¶ 55. Over the course of two-and-a-half months, Plaintiff's grandmother, Kay Cummings ("Ms. Cummings") paid nearly $10,000 to members of a gang within LVCC to protect Plaintiff. *Id.* at ¶¶ 55–58. Then, in the middle of July 2021, Ms. Cummings refused to make further payments. *Id.* at ¶ 59. At that point, she began receiving calls from Plaintiff and his cellmate "asking for money to 'stop something terrible from happening.'" *Id.* at ¶ 59. Having already expended a substantial sum of money, Ms. Cummings maintained her refusal to pay. *Id.*

With Plaintiff's "ransom still unpaid, the gang 'protection' ended" on July 21, 2022. *Id.* at ¶ 60. It was then that "[g]ang members sent a 'hitman' into [Plaintiff's] cell to assault [him]." *Id.* Plaintiff's cellmate, Kenneth Scott Marshall ("Marshall") recounted the details of the attack, wherein Plaintiff was "pinned . . . against the wall [and] repeatedly punched[ed] in the face" by a hitman ("Epps") wearing huge gloves that were likely "packed with salt to pack a harder punch." *Id.* Plaintiff then fell to the ground, and Epps began stomping his head, at which point Marshall attempted to intervene. *Id.* Epps briefly "lunged toward [Marshall]" before absconding. *Id.*

4

Marshall then "grabbed a towel and tried to stop the bleeding," and helped get Plaintiff to "medical." *Id.* at ¶¶ 60–61. Marshall noted that when they arrived at medical, Plaintiff "was still screaming . . . . His lower right eye lid was split open hanging on his face, and it looked like his eye might have been smashed." *Id.* at ¶ 61. Thereafter, Plaintiff was sent to the VCU trauma center "where the decision was made to have him airlifted to UNC Health for admission and oculoplastic management." *Id.* At UNC, Plaintiff was diagnosed with "significant blunt facial trauma resulting in right orbital fracture involving gas in the preseptal space and a large laceration of the lower right eyelid." *Id.* at ¶ 62. Plaintiff required reconstructive surgery, which took place on July 23, 2022. *Id.*

Plaintiff is now left with "a catalog of injuries," some temporary and some permanent, resulting from the "numerous assaults, extortion, and harassment" he endured at LVCC. *Id.* at ¶ 63. Plaintiff was ultimately transferred out of LVCC in September 2022. According to Plaintiff, "[h]is survival of his ordeal [at LVCC] was in *spite of* [Defendant's] policy and custom of indifference to the conditions of his confinement at LVCC." *Id.* at ¶ 64 (emphasis in original).

## II. PROCEDURAL HISTORY

Plaintiff filed his Complaint on May 15, 2023, asserting a sole, constitutional cause of action relating primarily to Defendant's alleged policy and custom or understaffing. Compl. ¶¶ 78–85. Specifically, Plaintiff avers that Defendant's "deliberate indifference caused . . . deficient staffing, supervision and control which, in turn, . . . caused Plaintiff's injuries." *Id.* at ¶ 85. On August 24, 2023, Defendant filed the instant Motion to Bifurcate, seeking to bifurcate Plaintiff's *Monell* claim and stay certain discovery in this matter.[1] *See* Mot. Bifurcate 1, ECF No.

---

[1] Because Plaintiff asserts only a *Monell* claim, Defendant's Motion to Bifurcate does not seek to bifurcate Plaintiff's *Monell* claim from another claim. Rather, Defendant's Motion essentially seeks to stay further litigation (including discovery) concerning Plaintiff's *Monell* claim until there is a preliminary finding that some individual

5

22. Plaintiff filed his Memorandum in Opposition to Defendant's Motion to Bifurcate on September 6, 2023. Pl.'s Mem. Opp'n Mot. Bifurcate ("Mem. Opp'n"), ECF No. 27. Defendant filed a Reply in Support of its Motion to Bifurcate on September 12, 2023. Def.'s Reply Supp. Mot. Bifurcate ("Reply"), ECF No. 28. The Court held a hearing on the motion on January 18, 2024.

### III. LEGAL STANDARDS

Federal Rule of Civil Procedure 42(b) governs bifurcation. Rule 42(b) states: "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b). Courts may also bifurcate a trial to avoid confusion or to serve the ends of justice. *U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 2007 WL 851823, at *1 (D.D.C. Mar. 14, 2007). District courts have broad discretion in determining whether to bifurcate claims for trial, and "the exercise of that discretion will be set aside only if clearly abused." *Beasley v. Kelly*, 2010 WL 3221848, at *3 (D. Md. Aug. 13, 2010) (citing *Dixon v. CSX Transp., Inc.*, 990 F.2d 1440, 1443 (4th Cir. 1993), *cert denied* 510 U.S. 915 (1993)); 9A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2388 (3d ed.) ("It is well-established by a wealth of case law that ultimately the question of whether to conduct separate trials under Rule 42(b) should be, and is, a matter left to the sound discretion of the trial court on the basis of the circumstances of the litigation before it."

District courts likewise have broad inherent power to stay discovery. *See Simpson v. Specialty Retail Concepts, Inc.*, 121 F.R.D. 261, 263 (M.D.N.C. 1988) (citing *Petrus v. Bowen*, 833 F.2d 581, 583 (5th Cir. 1987).

---

actor(s) violated Plaintiff's constitutional rights. Mem. Supp. Mot. Bifurcate 4, ECF No. 23. Defendant's position in this regard and the specifics of the proposed bifurcation changed slightly in Defendant's Reply, as discussed *infra*.

## IV. DISCUSSION

Defendant offers two main arguments in support of its Motion to Bifurcate: (1) before proceeding on his *Monell* claim, Plaintiff needs to show that individual actors violated his constitutional rights, and (2) the purposes of Rule 42(b) would be served by bifurcation of Plaintiff's *Monell* claim, as well as a stay of discovery on the same. *See* Def.'s Mem. Supp. Mot. Bifurcate ("Mem. Supp.") 2–5, ECF No. 23. In response, Plaintiff emphasizes that he is not contending any *individual* violated his constitutional rights, but instead that Defendant's unconstitutional corporate policy and custom of understaffing directly led to his injuries. *See* Mem. Opp'n 2–3. Ultimately, because Plaintiff is correct that bifurcation would be misguided here, the Court will deny Defendant's Motion to Bifurcate in full.

### A. Section 1983 and *Monell*

Plaintiff's sole claim for relief relies on 42 U.S.C. § 1983 ("Section 1983" or "§ 1983"), and more specifically, the *Monell* doctrine. Accordingly, a brief review of both Section 1983 and *Monell* is in order before consideration of the specific issues presently in front of the Court.

Section 1983 provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 28 U.S.C. § 1983. However, Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Accordingly, to state a claim under Section 1983, "a plaintiff must aver that a person acting under color of state law deprived him of a constitutional

right or a right conferred by a law of the United States." *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *see Filarsky v. Delia*, 566 U.S. 377, 392 (2012).

The Supreme Court in *Monell v. Department of Social Services of the City of New York* determined that local governmental bodies may also be held liable under Section 1983. 436 U.S. 658, 690–91, 694 (1978). Specifically, local government bodies may be liable under Section 1983 where the plaintiff can show that (1) the government body itself had an unconstitutional policy or custom, and (2) that unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. *See id.* at 690–91, 694; *City of Canton v. Harris*, 489 U.S. 378, 385–86 (1989); *Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016), *cert denied*, 137 S. Ct. 1342 (2017). Importantly, *Monell* liability has also been extended to private entities operating under color of state law. *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727–28 (4th Cir. 1999); *Haughie v. Wexford Health Sources, Inc.*, 2020 WL 1158568, at *15 (D. Md. Mar. 9, 2020). Moreover, the standards applicable to municipalities in the *Monell* context are equally applicable to private corporations acting under color of state law. *See Rodriguez v. Smithfield Packing Co.*, 338 F.3d 348, 355 (4th Cir. 2003).

**B. Bifurcation of *Monell* Claims**

Given the nature of *Monell* claims, "[c]ourts have consistently found that 'bifurcation of *Monell* supervisory claims from the individual claims is appropriate and often desirable." *Haughie*, 2020 WL 1158568, at *16 (noting that bifurcation is "common in § 1983 cases in which claims are asserted against individual defendants and their . . . employers."). Such is the case because "[g]enerally, a plaintiff's § 1983 claims hinge 'on his ability to show that [individual defendants] violated his constitutional rights.'" *Id.* (quoting *Baker v. District of Columbia*, 326

8

F.3d 1302, 1306 (D.C. Cir. 2003). In turn, "when no . . . employees are found liable, no subsequent trial of the municipality is necessary." *Beasley*, 2010 WL 3221848, at *3.

However, *"Monell* . . . and its progeny do not [always] require that a jury must first find an individual defendant liable before imposing liability on [a] local government." *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985). That is because "situation[s] may arise in which a finding of no liability on the party of the individual . . . actors can co-exist with a finding of liability on the party of the municipality." *Int'l Ground Transp. v. Ocean City*, 475 F.3d 214, 219 (4th Cir. 2007); *see Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 304–05 (7th Cir. 2010); *Bost v. Wexford Health Sources, Inc.*, 2017 WL 1862486, at *10–11 (D. Md. May 8, 2017); *Lindsey v. Orlando*, 232 F. Supp. 3d 1027, 1035. In such cases, *Monell* liability is therefore permitted to the extent that such a finding would not create an inconsistent verdict as to the individual defendants. *See Int'l Ground Transp.*, 475 F.3d at 219; *see also Thomas*, 604 F.3d at 305–05.

**C. Bifurcation Is Inappropriate Here**

Here, Plaintiff sets forth a single cause of action pertaining to Defendant's alleged policy and custom of understaffing. *See* Compl. ¶¶ 78–85. In other words, Plaintiff lodges *only* a *Monell* claim against Defendant. No individual defendants are named in the Complaint, and while some allegations pertain to the actions of individual actors employed by Defendant, the "overwhelming thrust of the factual allegations . . . focus on the broader context of how GEO's . . . culture and business model has . . . lead[] directly the injuries suffered by Plaintiff." Mem. Opp'n 2. Applying the principles outlined above to these circumstances reveals that this case is ill-suited for bifurcation.

9

      1. <u>Bifurcation is Not Necessary Under These Circumstances</u>

      Preliminarily, the Court notes that Defendant is indeed subject to *Monell* liability. As outlined above, *Monell* liability has been extended to private entities operating under color of state law. *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727–28 (4th Cir. 1999); *Haughie v. Wexford Health Sources, Inc.*, 2020 WL 1158568, at *15 (D. Md. Mar. 9, 2020). Here, Defendant is operating under color of state law, insofar as it contracts with VDOC, a state entity, to operate prisons—a power that is "traditionally the exclusive prerogative of the State." *Goldstein v. Chestnut Ridge Vol. Fire Co.*, 218 F.3d 337, 342 (4th Cir. 2000). Moreover, Plaintiff's allegations comply with the strictures of *Monell* and its progeny, insofar as Plaintiff alleges both (1) the existence of an unconstitutional policy or custom—understaffing—and (2) that said unconstitutional policy or custom caused his injuries. *See City of Canton v. Harris*, 489 U.S. 378, 385–86 (1989) (noting that *Monell* plaintiffs must generally allege both (1) the existence of an unconstitutional policy or custom, and (2) a causal connection between such policy or custom and their injuries; *Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016), *cert denied*, 137 S. Ct. 1342 (2017) (same); *Johnson v. Balt. Police Dep't*, 2020 WL 6728939, at *4 (D. Md. Nov. 16, 2020) (same); *Jones v. City of Danville*, 2021 WL 1582774, at *2 (same). Therefore, the only issue in front of the Court is whether bifurcation is appropriate here.

      In support of its Motion to Bifurcate, Defendant argues that "plaintiff has not named as a party a specific individual that violated his constitutional rights. However, [Plaintiff's] allegations . . . implicate particularized actions and omissions on the part of individuals such that the first prong of individual liability is a necessary part of Plaintiff's proof to proceed on his *Monell* claim." Mem. Supp. 3. Per Defendant, these are "fact-specific allegations of violations of Plaintiff's constitutional rights that require proof necessary prior to proceeding on Plaintiff's *Monell* claim[]."

*Id.* at 4. Defendant continues by arguing that "[g]iven the breadth of Plaintiff's *Monell* allegations, . . . the scope and magnitude of *Monell*-related discovery will be substantial" and necessarily delay trial. *Id.*; Reply 4. As such, Defendant argues that bifurcating trial and staying discovery on the *Monell* claim "would allow the Court to set an expedited trial date on the underlying claims under the normal time constraints of the Court, rather than entertaining a request for extended discovery period and a later trial date on all claims combined." Mem. Supp. 4.

Plaintiff responds first that "the overwhelming thrust of the factual allegations in the Complaint are not centered around the actions of particular individuals, but rather focus on the broader context of how GEO's profit-drive corporate culture and business model has infected its operations nationally and . . . at LVCC, leading directly to [Plaintiff's] injuries." Mem. Opp'n 2. Plaintiff then argues that under such circumstances, "a *Monell* claim does not have to be tethered to specific individual liability" as Defendant argues. *Id.* at 3. This is because "[r]ather than condemning particular individual conduct, the Complaint . . . alleges that the unconstitutional conditions at LVCC derived from *who was not there* due to [Defendant's] policy of understaffing." *Id.* According to Plaintiff, "[t]his case is, therefore, uniquely about [Defendant's] policy that allowed 'gangs to virtually ruin the institution.' The Court should not allow [Defendant] to pass the buck to individuals—without adequate corporate support, staffing, or funding—who happened to work there." *Id.* at 5 (quoting Compl. ¶ 29).

Ultimately, the Court is not convinced that bifurcation is necessary here. Plainly, the instant allegations do not require Plaintiff to first establish that an individual defendant is liable for violating Plaintiff's rights before *Monell* liability may be imposed. That is because "a finding of no liability on the part of the individual . . . actors can co-exist with a finding of liability on the part of [Defendant]." *Int'l Ground Transp., Inc.*, 475 F.3d at 219; *see also Thomas v. Cook Cnty.*

11

*Sheriff's Dep't*, 588 F.3d 445, 456 (7th Cir. 2009).  Plaintiff's sole contention is that Defendant's policy or custom of understaffing caused his injuries.  By its very language, this allegation does not implicate individual actors.  And in fact, the thrust of Plaintiff's Complaint is that the *lack* of individual actors working for Defendant is what caused his injuries.  Under such circumstances, a finding of liability on behalf of individual actors is not a prerequisite for a finding of liability as to Defendant.  *See Bost v. Wexford Health Sources, Inc.*, 2017 WL 1862486, at *10 (D. Md. May 8, 2017) (noting that situations wherein the combined actions of multiple officials or employees may give rise to a constitutional violation supporting *Monell* liability, but where no one individual's actions are sufficient to establish personal liability for the violation, "most often arise in cases where a plaintiff alleges understaffing by [the defendant]."); *Haughie*, 2020 WL 1158568, at *15 (same); *Terry v. Cook Cnty. Dep't Corr.*, 2010 WL 2720754, at *2–3 (N.D. Ill. 2010) (relying on *Thomas v. Cook Cnty. Sheriff's Dep't* to deny the defendant's bifurcation motion where some of plaintiff's claims related to understaffing).

   Defendant's additional argument that Plaintiff must first prove he suffered a constitutional violation *generally* before he can proceed on his *Monell* claim is similarly misguided.  *See* Reply 2–4.  Simply, it is near impossible—and certainly impractical—to effectively split the two issues in the way Defendant requests.  Plaintiff can only prove his *Monell* claim by establishing the existence of an unconstitutional policy or custom *and* causally connecting said policy or custom to the harm he ultimately suffered.  *See Monell* at 690–91, 694; *City of Canton v. Harris*, 489 U.S. 378, 385–86 (1989); *Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016), *cert denied*, 137 S. Ct. 1342 (2017).  And because Plaintiff asserts *only* a *Monell* claim, he needs evidence of both the alleged unconstitutional policy and custom *and* its specific connection to his injury to

12

prove his case.[2]

In view of the above, it is clear bifurcation is not strictly necessary—nor appropriate—under these circumstance—i.e., a *Monell* claim only alleging understaffing in violation of the Eighth Amendment.  That said, the Court must still consider the discretionary factors outlined in Rule 42(b) to determine whether bifurcation is nevertheless appropriate.

    2. <u>The Rule 42(b) Considerations Do Not Counsel in Favor of Bifurcation or a Stay of Discovery</u>

Rule 42(b) provides that, "[f]or convenience, to avoid prejudice, or to expedite and economize, . . . court[s] may order a separate trial of one or more separate issues, claims, crossclaims, or third-party claims." Fed. R. Civ. P. 42(b).  Additionally, courts have broad inherent power to stay discovery.  *See Simpson v. Specialty Retail Concepts, Inc.*, 121 F.R.D. 261, 263 (M.D.N.C. 1988) (citing *Petrus v. Bowen*, 833 F.2d 581, 583 (5th Cir. 1987); *accord* Fed. R. Civ. P. 26(a)(1)(B) (noting that courts may alter the scope of discovery via order).  Ultimately, the Court is unconvinced that any of the relevant interests weigh in favor of bifurcation or a stay of *Monell* discovery.

Defendant argues that "[g]iven the breadth of Plaintiff's *Monell* allegations, . . . the scope and magnitude of *Monell*-related discovery will be substantial . . . [and] necessarily delay trial." Mem. Supp. 4.  Defendant continues that *Monell* discovery is likely to raise disputes "regarding the breadth and scope of discovery that the Court may need to resolve." *Id.*  Defendant also argues

---

[2] This situation stands in contrast to those where a plaintiff asserts a *Monell* claim *as well* as Section 1983 claim(s) directed at individual(s).  Under those circumstances, it often makes good sense to bifurcate the matter to determine whether that individual actor violated the plaintiff's constitutional rights, before then moving on to determine whether an unconstitutional policy or custom was the driving force *behind* the individual conduct.  *See Haughie*, 2020 WL 1158568, at *18; *Lindsey*, 232 F. Supp. 3d at 1035 ("Bifurcating the claims makes particular sense where the *Monell* claim is wholly dependent on the outcome of the cases against the individual defendants.")  But here, there is no challenged individual conduct.  Instead, Plaintiff solely alleges a corporate policy or custom that led to the *absence* of individual conduct.  Therefore, the evidence Plaintiff needs to prove he suffered a constitutional harm is essentially the same as the evidence needed to prove the existence of an unconstitutional policy or custom.

13

that broad *Monell* discovery will produce "burdensome and potentially unnecessary discovery and litigation costs." *Id.* at 5. In response, Plaintiff argues that "it is the sprawling nature of GEO's well-documented corporate misdeeds that warrant complete discovery in this case." Mem. Opp'n 5. Per Plaintiff, "[Defendant] should not be allowed to avoid 'litigation costs' and attempt to shield itself behind its employees any longer." *Id.* at 6 (quoting Mem. Supp. 5).

The Court is simply not persuaded that either bifurcation or a stay of discovery on *Monell*-related issues is warranted—or feasible—in this matter. Preliminarily, Defendant's request that the Court bifurcate Plaintiff's *Monell* claim against it is essentially impossible to do, insofar as Plaintiff *only alleges* a *Monell* claim. Put another way, there is nothing to bifurcate.[3] And to the extent bifurcation and a stay of discovery *would* be feasible, practical considerations weigh against bifurcation and a stay of discovery. The issues Defendant seeks to bifurcate are inextricably intertwined with one another, and discovery will inevitably overlap.[4] Further, if the Court *did* split the matter (and stay discovery) as Defendant requests, it seems just as likely that discovery disputes will arise as to what exactly constitutes permissible versus impermissible discovery. *See Black v. Hernandez*, 2019 WL 13166588, at *2 (N.D. Ill. 2019) (noting that bifurcating *Monell* discovery often tends to prolong cases and lead to more unnecessary discovery disputes). Finally, while

---

[3] Defendant's slightly amended request in its Reply fares no better. There, Defendant asks the Court to "bifurcate discovery and trial into two distinct areas, and stay discovery on the latter: (1) Issues and facts relating to actual understaffing of LVCC and whether that resulted in a violation of Plaintiff's constitutional rights, and only after the jury has ruled in his favor, (2) Plaintiff's assertion that Defendant had a custom and policy of understaffing that led to Plaintiff's injuries." Reply 5. As a practical matter, it is unclear how the Court could effectively do so, given the inevitable overlap between the issues in these two areas. Moreover, Defendant's concern regarding a "high likelihood of disputes regarding the breadth and scope of discovery," Mem. Supp. 4, is even more likely to materialize in the event the Court attempt to split the matter in such a way, given the difficult line-drawing questions that will arise. *See Black v. Hernandez*, 2019 WL 13166588, at *2 (N.D. Ill. 2019). Thus, practical considerations weigh against bifurcation (and a stay) regardless of how Defendant argues the matter should be divided.

[4] As discussed above, Plaintiff's claim that he suffered a constitutional violation as a result of a broader custom or policy necessarily requires discovery as to the alleged existence of such a policy. Limiting discovery to the three days that Plaintiff was *physically* harmed would therefore make it practically impossible for Plaintiff to actually prove his *Monell* claim.

14

some of the *Monell*-related discovery may be costly, "that alone is an insufficient reason to order bifurcation" of such claims. *Id.*; *see Cadiz v. Kruger*, 2007 WL 4293976, at *3 (N.D. Ill. 2007) (noting that "vague assertions" regarding the expense of *Monell* discovery are insufficient to support bifurcation of a *Monell* claim).

At bottom, while *Monell* claims are generally "good candidates for bifurcation," *Beasley v. Kelly*, 2010 WL 3221848, at *3 (D. Md. Aug. 13, 2010) this matter represents an exception insofar as Plaintiff does not allege—and his claim does not depend on—the violation of his constitutional rights by any one individual actor. *See Bost v. Wexford Health Sources, Inc.*, 2017 WL 1862486, at *10–11 (D. Md. May 8, 2017); *Terry v. Cook Cnty. Dept. Corr.*, 2010 WL 2720754, at *1–3; *Haughie v. Wexford Health Sources, Inc.*, 2020 WL 1158568, at *17–18 (D. Md. Mar. 9, 2020). Accordingly, bifurcation of this matter is unnecessary and impractical. Moreover, the Court is not persuaded that the relevant considerations (i.e., efficiency, convenience, or to avoid prejudice) favor bifurcation.

## V. CONCLUSION

For the reasons stated both on the record at the January 18, 2024, hearing, as well as in this Memorandum Opinion, the Court will deny Defendant's Motion to Bifurcate (ECF No. 22). An appropriate Order will accompany this Memorandum Opinion.

Let the Clerk file this Order electronically, notifying all counsel of record accordingly.

It is so ORDERED.

/s/ RCY
Roderick C. Young
United States District Judge

Richmond, Virginia
Date: January 29, 2024